Are we ready in the first matter? Miss, you have to pronounce your name for me. I'm sorry. Diana Stavroulakis, Your Honor. Okay, say it one more time. Stavroulakis? Stavroulakis. Miss Stavroulakis, that's correct. Okay, thank you. Okay, and... May it... Go ahead. May it please the Court, I would like to reserve five minutes for rebuttal, if I may. Okay. I just want to be sure that Mr. Lazar can hear you. Mr. Lazar, are you there? Yes, I am. He is right here, Your Honor. Oh, he's with you? Okay. I couldn't see him. He is with me, yes. Okay, can you keep an eye on him, because we can't see him. Okay, I will keep an eye on him. Okay, go ahead. May it please the Court, the initial issue in this case is whether the rule in Hubbard, which caused the procedural default in state court, can act as a bar to federal review in this case. And it is Mr. Schott's argument that it cannot. The rule in Hubbard required that claims of trial counsel's ineffectiveness had to be raised at the first opportunity with new counsel. That became an impossibility in this case, because first new counsel was court-appointed direct appeal counsel, who never filed the direct appeal. And in fact, substitute counsel was appointed after that also to file the direct appeal. That attorney did not file the direct appeal. So essentially, the first attorney of record was actually PCRA counsel Morocco, who did raise claims of trial counsel's ineffectiveness. Therefore, the state court... Let's say that there was an exorbitant application of the Hubbard rule, which has now been, I guess, overruled by Grant. How was Mr. Schott's prejudiced by Astin's failure to... I'm working... Let's say we get past that. How was he prejudiced by the failure to conduct discovery? To go to plea counsel's substandard representation, Mr. Astin did not conduct any discovery. He did not review police reports. He did not review... The question assumes all that. Let's assume his performance was subpar in terms of the Strickland test for problem one. The question then is, and this skips through all the preliminary hurdles, where's the prejudice here? The prejudice is that he was not able to give Mr. Schott's adequate advice to consider before rejecting a plea offer for 10 to 20 years and entering a general plea, which in the end he received 30 1⁄2 to 133 years. Had Mr. Astin... But if you put yourself in Mr. Schott's and Mr. Astin's position, you've got a case where there's been an offer of 10 to 20. He's got a person with a big record, and he's really trying... His strategy is I need to plead this out in a way that doesn't subject this person to, you know, something that's over the top. He is told that it could be 10 to 20. The judge then makes the offhand comment at that time that 10 to 20 seems a bit high in light of Mr. Schott's cooperation. If you're in Mr. Astin's position, you're saying to yourself, this clearly is the best road to take. This is support for the position, the strategy that I've set out. And the fact that the judge changed his mind and Mr. Schott's was told before they went in that he told him that, hey, if they do get to all of these crimes and start adding them up, I mean, it's going to be a big number. What else could Mr. Astin have done? I think Mr. Astin could have told him in a definite number the maximum sentence he could receive. I don't think it's enough in a case where you have 12 cases joined going to trial, going to a plea with major crimes with multiple victims. Many of the victims victimized more than one time, and these are all things that the sentencing judge was going to consider. I think you have to review that file and then say to Mr. Schott's, you could receive maybe a maximum of 155 years. So although the court has indicated you might do better, you might not. What's the difference between that other than specificity and telling the defendant, look, if these things are all run consecutively, you could get to a very big number very quickly. What's the difference between telling the defendant, look, if you reject this plea, you're going to be looking at a very big number, theoretically, as opposed to saying specifically what the number was. He's got one number that he knows is on the table, 10 to 20. If you reject that, he knows not the number, but he knows that whatever that X is, it's going to be a very big number. Well, you're saying that you have to actually specifically tell them what the mathematical calculation is, the actual number of months that you're looking at? I do. It's a very simple thing to do is just to go through and add up his, you know, at each count, at each criminal complaint, this is the maximum, because I think that puts things into perspective for someone who's about to reject a very good plea deal to end up with a result that I don't think anyone intended. He ended up with a sentence that was more than three times greater than what he was offered. And so I think this all goes into the ineffectiveness of plea counsel in not adequately advising his client of what to do before he rejected this plea. Go ahead. I'm sorry. Go ahead. So I don't think it's enough to say, boy, after a while, that could get up there. That could mean a lot of different things to different people. I think he needed to tell this man, you could get 155 years. As it turned out, he got 133 years after being offered 10 to 20. So, no, I do not think he... These were all first-degree felonies, all 13 charges that he was... They were not all first-degree felonies. They were misdemeanors, felonies, there were even some summaries in there. But, as I said, they were all major crimes with many victims, a lot of restitution. You said major crimes, but you said there's some summaries, some misdemeanors. Those are not major crimes. I thought they were looking at basically 13 residential burglaries, but that's not the case? Some were businesses. Some were businesses. But I still think that these are things that the sentencing court ultimately considered when he imposed the sentence. And he imposed the sentence not only consecutive at each case, but in some instances, a consecutive sentence at each count of some of the cases. So, the consecutive nature was something that should have been explained to Mr. Schatz. You're looking at 12 cases. He could sentence you consecutively at every count, at every case. That is a huge number, and I think it was a simple thing to say. It could be 155 years, and he received just shy of that. He received 133 years. Some of them, there was merger. Some of the counts merged, and I did not count those during my edition. What is the evidence only that even if he had told him, okay, he said, you know, offhandedly, this could really mount up, but if he had said, okay, it could be 150 years, whatever it is, what objective evidence is there that Mr. Schatz would have accepted the 10- to 20-year plea bargain offer by the prosecution? The fact that Mr. Schatz wanted the lowest sentence that he could receive. And I think we also need to look at what happened at the first date scheduled for sentencing. It was on that date. That argues that when the judge made the offhand comment, 10-20 seems high. The lowest sentence he could possibly get would have been less than 10-20, so he rolled the dice, and unfortunately, he lost. He rolled the dice based on what the judge had commented. That is true. And I think their first indication that things weren't going as planned was on the first date for sentencing when plea counsel brought that up to the court and the trial judge said, oh, hey, wait a minute. I don't know anything about how much input Mr. Schatz gave or how much he helped, and so, you know, that doesn't factor in at all. Well, that was the whole basis on rejecting the plea, and at that point, Mr. Astin is on notice that things aren't going as planned, and he admits that there's correspondence from his client. What's gone wrong? I think I better withdraw my plea. He does not respond to Mr. Schatz. He doesn't do anything. It continues to sentencing, and as we know, things snowballed out of control, so there was an opportunity to do something to help Mr. Schatz, and it was never done, including saying right on the record the day he was resentenced, I want an appeal. I want a new lawyer. I want to claim the ineffectiveness of this attorney, and unfortunately, he was never able to do that because he's never had a review of the substantive merits of his case, and that's really the problem in this case, and that's why I'm asking the federal court now to not let the state court procedural rule bar your review of those underlying issues, that he failed to prepare for trial and that he did not give adequate advice to his client before he entered the plea. The procedural part of this is the easy part. Exerting an application to me, again, we haven't conferenced this case. I don't have a problem getting around the Harvard issue. The problem here is what Judge Ambrose just asked you about, the prejudice prong. To me, that's the gigantic obstacle that you've got to overcome, and I'm not so sure that you're able to do it. You're asking us to basically fashion a rule that would say that rather than the defendant having a good idea of his maximum exposure as defined by a quantitative assessment of the amount of imprisonment, that quantitative assessment has to be specifically defined and reduced to a numerical value in the amount of months. That's what you're saying. I am saying that. I think a defendant needs to know what he's facing, particularly in a case like this. If he's facing a couple of lifetimes imprisonment, would that be enough? Your Honor, I think that if he was told that, he would have rejected that and gone ahead and accepted the plea agreement. I mean, this is a case where he has rejected a plea offer. To your argument, that's still ineffectiveness. If he's told up front that he's going to face two life sentences, well then that attorney has been specific and told him what he can face. He can't get an official sentence of life on any of these charges. He can get a lifetime equivalent of jail time, but he can't get a sentence of life imprisonment. So if he's told, look, you could get a couple of lifetimes, the judge could hit you with incarceration for a couple of lifetimes on the sentences, depending on what emerges, what doesn't emerge, what is made concurrent, what is made consecutive. Under that scenario, the defendant still does not have a quantitative definition of the amount of time he's going to serve. Your argument would say that that would not be effective in the existence of counsel, because he doesn't have a number. I think his idea then has changed. I mean, we don't have that fact pattern here, but if he is told you're going to get the equivalent of a life sentence if you reject this plea offer and the court does not give you a more lenient sentence. But that isn't what happened here. Mr. Astin testified at the PCRA hearing that he never gave him an actual number and said, oh, it could add up pretty quickly. That's not the same as saying you could get the equivalent of a life sentence. No, he said a very large number very quickly. I'm sorry? No, you're right. It's not the same. He said a very large number very quickly. But you've saved some time. Let's hear from Mr. Lozarro and then let's do other questions and we'll come back to you. Thank you, Your Honor. Thank you. Thank you. Good morning. May it please the Court. I'm Jim Lozarro on behalf of the appellee. And I'd like to first start out by noting that it's the unenviable task of anyone to stand before the court and attempt to justify the result of what's happened to Mr. Schatz in light of having five attorneys who appear not to have done what was necessary in state court. However, I'd ask the court to look deeper into the case at the actual cause of Mr. Schatz's lengthy incarceration time and consider that each of the five attorneys who came after plea counsel really had no role in that. And their failures, while they may have caused a procedural bar, they didn't prevent the review of a substantive claim that would have resulted in any change for Mr. Schatz. You've got to help me understand what you just said because I'm not sure I followed. Well, what I mean is that while there were five attorneys who arguably gave Mr. Schatz substandard representation. One didn't even know she'd been appointed. I'm sorry? One didn't even know she'd been appointed. Another one closed the law office a few months after she was appointed. This is kind of a joke. Absolutely. And it's really a head-scratching case when you look just at the attorneys who were appointed to represent Mr. Schatz after his plea. However, what I was saying was that Mr. Schatz's sentence came well before those attorneys were ever appointed. The real questions at issue here are, I think, strictly limited to Mr. Astin's performance. And the question about Hubbard and whether it's exorbitantly applied in this case, I think, are not. The number of attorneys and their failure does not lead to the conclusion that Hubbard was applied in an exorbitant fashion in the case. Wait a minute. Mr. Schatz raised his ineffectiveness claim, I think, at resentencing in his pro se PRCRA petition. Is that correct? That's correct. So how else was he supposed to preserve the claim against Astin? Well, in his subsequent PCRA petitions, and actually in that very first petition, Mr. Schatz did, in fact, raise the claim against Mr. Astin. But at that time, he was required also to raise the ineffectiveness of the two attorneys who were appointed who did nothing for him. And their failure to raise Mr. Astin's and Ms. Unkoff's... Put yourself in Schatz's position. The attorney who was with him at the time of the plea and the sentencing was Astin. He said at the first time that I think he could, at least at resentencing and in his PCRA petition, that attorney was deficient. And the question then becomes, well, did he have an obligation to make a claim against the other attorneys who later represented him in connection with the post-sentencing matters? And there were a slew of them, and it wasn't really his fault that they kept changing. I'm trying to figure out what perceivable state interest is served by the Hubbard Rule after the Picker Court had already considered the merits. Well, I think that the Hubbard Rule's state interest was always judicial economy and preserving the finality of judgments. And I think that those are furthered. I mean, even the Pennsylvania Supreme Court is saying in Grant, you know, we've gone way too far. And why isn't this case like the Supreme Court case in Lee, which says, you know, when you take a procedural rule and you don't let somebody get to the merits, you know, let's not go overboard. Things have to be in some form, some balance, a range of reason, and this goes too far. Even the Pennsylvania Supreme Court, I've never seen this before. As you probably hear, I don't think it's any surprise to you, there's sometimes tension between the federal courts and the state courts arising from our oversight on state behavior. Even the state Supreme Court has a footnote basically saying, look, there's nothing we can do for you. Any relief you're going to have to get is going to come from the federal courts. I was shocked when I saw that in their opinion. I've never seen it before. I've never seen a state court basically invite a defendant to go into federal court. I've never seen it before. In 18 years here, I've never seen it. Basically, I can't do anything, but you really need to go to federal court because there's something wrong here is really what he's saying through the lines. Right. I think that footnote is troubling, but at the same time, it's acknowledgement that the only place he has left to go is federal court. It does go a little further and indicates that the Superior Court believes he should have some sort of relief, but I don't think that necessarily would result in that relief coming from this honorable court. I think that the real question that I had after looking at that footnote is, why would the Superior Court not have reviewed this case like the PCRA court did? Because Judge Hathaway, dealing with the PCRA issues, overlooked the Hubbard violation, being that it was about six or seven years abrogated at that point, and addressed these issues, some of them specifically on their merits and some of them were found to be waived, but then addressed on their merits in her own footnote. So why the Superior Court relied upon Hubbard when there were alternative holdings that would have addressed the merits, I don't know. I think I understand why the court would be interested in such a footnote, but I don't think it necessarily follows that relief is due to Mr. Schatz because of that notation in the Superior Court's opinion. Look at that, we have a situation where the trial attorney, I'll call him the trial attorney, the pre-counsel basically said, look, I did not want to make the prosecutor do his job because that would ruffle his feathers, that would determine it. Asking him for discovery in all these cases, I didn't want to get him upset because I wanted to get a good deal for him. So you've got a defense attorney who's basically saying, I don't want the prosecutor, who's an officer of the court, to be asked to do his job because if I make him do his job, he may get upset at me and he may not give my client as good a deal. Is that the kind of system we're stuck with? Is that the state of justice in whatever county this came out of? No, Your Honor, and I have to, I understand and I would feel compelled to note at this time that Mr. Schatz's case is not representative of the competency of the Westmoreland County bench and bar, but I would like to say that Mr. Astin didn't state in his testimony that he did not receive discovery. What he said was that he wasn't sure if he had or not, and if he hadn't, one of his reasons not for requesting it would have been because he didn't want to ruffle the feathers of the district attorney's office. Was that their job? It is, and absolutely, and I'm not here before you to argue that that would ruffle the feathers of our office or that that's a reason not to request discovery, but what I'm saying is he didn't articulate that he did not receive discovery. He didn't recall whether he had or not, and he did, however, establish in his testimony that he was familiar with the ins and outs of Mr. Schatz's cases, that he discussed the cases with Mr. Schatz, that Mr. Schatz had provided substantial confessions in each of his cases, and that was generally the way Mr. Schatz operated. Once he was caught, he came forward and told the police what it was that he had done, and that Mr. Astin was operating under the, with the direction of Mr. Schatz, the purpose of securing the best outcome for Mr. Schatz he could in a plea form, and it was to that end that Mr. Astin, and I believe it was Mr. Dongleware from my office, and the judge had a conference where it was the judge that suggested that amount of time seemed like a lot for someone who cooperated in a large-scale corruption case in the county. Mr. Astin then presented testimony at the sentencing hearing about that cooperation, and it really wasn't, at the time of the plea, it appeared that the best part of Mr. Schatz's case was his cooperation, and in the furtherance of getting Mr. Schatz a beneficial sentence, Mr. Astin presented that evidence that was most beneficial to him, which was testimony from the prosecutor at the Attorney General's office who prosecuted the Weathers corruption case to demonstrate what Mr. Schatz had done. But was Judge McCormick the same, was he the judge who made the comment that 10 to 20 seemed high? He was, he was that judge. He was also a sentencing judge. What happened between then and the sentencing that caused him to change so radically? Well, I understand that a pre-sentence investigation was ordered after the pleas were entered, and I believe that it can be read from the record that it was that pre-sentence investigation and the testimony at sentencing that must have changed the judge's mind. Beyond that, I'm not sure it's a matter of record why exactly the judge sentenced Mr. Schatz as he did, except the statements he made on the record at sentencing, which indicated that the judge believed that Mr. Schatz would help out whenever it looked like it was going to help Mr. Schatz. And he had a career of crime, and the judge decided that this was the appropriate result and consequence of that. The 25 friars, were they also a pattern of burglaries or felonies? I know they're expected to list every one of them, but generally, what was it? Do you know the 25 friars? Your Honor, I don't know his history because it wasn't one of the issues that I dealt with, I apologize. I don't want to speculate as to what specifically he had in his history. That's fair. Apparently at one point he came into court having been beaten up as a result of his cooperation. I don't know if that was before that or not. I'm not sure if it was either. I do know that he had safety concerns that were addressed by moving him between different county jails. I think he was housed in Allegheny County Jail for a period of time, and then eventually he was released. And it was on his release that the second set of these charges were filed and these offenses were committed. And I think that's part of what may have offended the judge about Mr. Schatz's case to result in this type of sentence. But once again, I don't want to speculate about why the judge did what he did. I would like to note, before I run out of time, that if the court finds that this was an exorbitant application of the Hubbard rule, we would submit that this case still stands as two issues that were addressed on the merits by the PCRA court. Judge Hathaway addressed the maximum sentence issue specifically in the text of her opinion, and she addressed the discovery issue in a footnote. She addressed it in a footnote both dealing with the fact that it was also waived because it had not been raised in the second amended PCRA petition, and also on the merits, noting that he did not articulate any prejudice from them. And for those reasons, I believe that Mr. Schatz is not entitled to relief. And if there are no more questions, I thank the court. Okay, Mr. Nassaragas, thank you very much. Thank you. Try it one more time. What was that? I'll adopt what he just said. That was perfect. Thank you. I would just like to go back again to Mr. Astin's representation as part of the plea process and the time that lapsed between entering the plea and the sentencing date. And I think during that time, once there was the pre-sentence investigation report and he had the benefit of sentencing guidelines, when it became clear to Mr. Astin that things were not looking good for Mr. Schatz and Mr. Schatz was writing to him saying, I think I need to withdraw my plea, this isn't what we thought was going to happen, this indicates that they both felt that the trial court was going to impose a much less severe sentence than the offer of 10 to 20. And when it became clear that that wasn't going to happen, Mr. Astin needed to have done something. And as the court pointed out. Because at that point, as everybody agrees, the sentence is up to the judge. Even if there's a deal for 10 to 20, it's still up to the judge. So what is the something that Astin should have done at that point? Things start going south, it looks kind of bad. You mentioned the guidelines, but the guidelines, this guy is not anywhere near qualified. Unless they've changed. Since I was with the Guidelines Commission in Pennsylvania, it caps the prior record score. This guy, I mean, it is so far off the charts, the Pennsylvania prior record score. Will you max out, is it still six? The prior record score maxes out at six points? I believe it is, yes. But I think what my point is, what he could have done is withdraw the plea and go back to negotiations and perhaps at that point accept the plea agreement. That was something that Mr. Schatz wanted to do. And he expressed this to Mr. Astin. He expressed this, that he wanted to file a direct appeal, which would have also been post-sentencing motions, where he could have raised the severity of the sentence. And, you know, none of this was pursued. He's prejudiced by all this. It's a whole different issue, and frankly, I'm not unsympathetic to it, but I'm not sure that anything can be done about it. The judge didn't even know how much total time he imposed. Now, to me, that's unconscionable, that a judge can impose a sentence and not know what the maximum is. You just hit the guy with it. Right, he said that, yes, sometime, yeah. But isn't it before us? I mean, isn't that what happened here, is that we have a case, and I just want to cite again, too, just by analogy, the more recent Supreme Court cases of Missouri v. Frye and LeFleur v. Cooper. Although those are not factually the same, what we have here is an acknowledgment that the plea bargain process is an important part. Missouri v. Frye, I mean, Missouri v. Frye and LeFleur are very different than this. Those are cases where the counsel did not tell his client what was offered. This is a case where not only did Astin tell Mr. Schatz what was offered, he also noted that Judge McCormick made the offhand comment that that seems a bit high. So, I mean, in that respect, Astin did his job right down the line. The question is, should he have, what you're really saying is, should he have actually added up the numbers? The numbers were so high, I think the judge at Sentencing said, I think I need a calculator. I don't know what they are. Yes. He said someone will, by the end of the day, someone will have added this up. But I think that speaks to my point, is that if Mr. Astin was going to advise his client, reject that plea of 10 to 20 on 12 cases, and instead plead generally, I think he needed to say, you also need to know that you could receive up to 155 years in prison. What prevents him from saying that? I mean, you're taking an individual that needs to know what he's waiving and what he's rejecting. I mean, the reason I'm comparing Missouri and LeFleur is that he rejected a plea offer based on the representations of his attorney. And I'm saying his attorney needed to be clear to him. You can reject this plea, but you also could receive this. And just saying it could add up, who knows? That's subjective. Who knows what that means to one person or another? The indication was he was going to receive a lesser sentence. He received a much more severe sentence. And I would ask the court to send this case back to have the DA reoffer that plea offer of 10 to 20 and go back to resentencing at this point. Do you know of any case where that's been the remedy? Yeah. Any case where we've done that? For any state court case? Any case where we sent it back and told the, basically given specific performance and asked the DA to reoffer the plea? I don't know it's ever happened. Here or any place else? Yes. This is the first time you can do that. I would ask you to do that. It's your chance. I hear it's opportunity knocking. Opportunity is knocking. And I think if any case deserves it, no one can dispute that something went horribly wrong in this case. And I think we do have to look to Attorney Aston's performance. And I think based on what happened, the fact that he didn't pursue it after that, he didn't file a direct appeal, he didn't ask for a review of the sentence, the case just lingered through the system. He was sentenced in 2001. He never had a PCRA hearing until 2007. So, I mean, no one has helped Mr. Schatz. I'm here to help Mr. Schatz today, and I would ask the court to consider these things and give an equitable result to Mr. Schatz. Thank you, Ms. Javulakis. Did I get it right or was I close? That was perfect. Okay. Thank you. I didn't get it the same as his. They can't both be perfect. Well, you added an extra R, but, you know, I want to bar their extra favor, so thank you, Your Honor. Thank you very much. We'll take the matter under your advisement.